IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

DANELLE DUNCAN,

                Plaintiff,

v.

ASSET RECOVERY SPECIALISTS, INC.,
GREG STRANDLIE, and WELLS FARGO
BANK NA d/b/a WELLS FARGO DEALER
SERVICES,

                Defendants.

OPINION AND ORDER

16-cv-530-wmc

In this civil action, plaintiff Danelle Duncan asserts a variety of federal and state law claims against defendants all arising out of their repossession of her vehicle and holding of personal belongings contained in it. Before the court is defendants' motion for summary judgment on all claims. (Dkt. #33.) For the reasons the follow, the court will grant defendants' motion as to plaintiff's only federal claim, which is based on defendants Asset Recovery Specialists, Inc., and Greg Strandlie's alleged attempt to collect $100 from Duncan to retrieve her personal belongings, and decline to exercise its supplemental jurisdiction over the state law claims, dismissing those claims without prejudice.[1]

---

[1] While plaintiff does not allege the citizenship of the parties, nor was she required to in light of the asserted federal claim, the court infers that both Duncan and defendants ARS and Strandlie are all citizens of Wisconsin, and therefore there is not complete diversity between the parties to allow for the exercise of jurisdiction pursuant to 28 U.S.C. § 1332(a). The court will exercise supplemental jurisdiction for the limited purpose of entering summary judgment in defendants' favor on plaintiff's unreasonable sale claim against Wells Fargo. Plaintiff conceded in her opposition brief that that claim should be dismissed with prejudice. (Pl.'s Opp'n (dkt. #41) 1 n.1.)

# UNDISPUTED FACTS[2]

### A. Duncan's Vehicle Purchase and Loan

On November 12, 2013, plaintiff Danelle Duncan purchased a 2014 Kia Optima from Russ Darrow Madison, LLC. She paid $10,000 at the time and financed approximately $23,000 more via a retail installment contract with Russ Darrow. (Raabe Aff., Ex. A (dkt. #36-1).) To obtain the loan, Duncan gave a security interest in the vehicle as collateral for the loan. That same day, Russ Darrow assigned its interest in the retail installment contract to defendant Wells Fargo Bank NA d/b/a Wells Fargo Dealer Services. As such, Wells Fargo became the lien holder for the 2014 Kia Optima.

### B. Duncan's Default

Duncan used the vehicle for her own personal, family and household purposes, but failed to make full and timely payments as required under her retail installment contract for the months of December 2014, January 2015 and February 2015. As a result, on February 26, 2015, Wells Fargo sent Duncan via certified mail a notice of right to cure for past due amounts totaling $887.15. (Raabe Aff., Ex. B (dkt. #36-2).) In response, Duncan managed to make certain payments, but then failed to make full and timely payments as required for the months of May 2015, June 2015 and July 2015. On July 30, 2015, Wells Fargo then sent Duncan a second notice of right to cure, this time for past due amounts totaling $1,907.76. (*Id.*, Ex. C (dkt. #36-3).) Following that notice, Duncan appears to

---

[2] The court sets forth all of the proposed findings of facts for a full description of the record, recognizing that certain facts are principally or exclusively relevant to the state law claims over which the court declines to exercise jurisdiction. Unless otherwise noted, the court finds the following facts undisputed and material for the purpose of deciding the present motion only.

have made some additional payments, but again failed to make full and timely payments as required under the contract for the months of August 2015, September 2015 and October 2015. On October 28, 2015, Wells Fargo sent Duncan a third notice of right to cure, this time seeking past due amounts of $1,372.70. (*Id.*, Ex. D (dkt. #36-4).)

Each of the three notices sent Duncan included the following statement:

> SPECIAL NOTICE: If you do not either (1) pay the total amount past due as stated in paragraph 1 or (2) perform any covenants required to be performed as stated in paragraph 2 by the date indicated above, then your entire outstanding balance will become immediately payable without further notice, demand or right to cure.

(Defs.' PFOFs (dkt. #34) ¶ 10.)

After the third notice of right to cure, Duncan made a payment of $500 on November 23, 2015, and $300 on January 12, 2016, which unfortunately did not cover the total amount past due. Duncan admits that she had not brought her loan current as of January 27, 2016. Indeed, at her deposition, Duncan testified that she had no ability to dispute the accuracy of Wells Fargo's loan payment data generally.

### C. Repossession of Duncan's Vehicle

Wells Fargo contracts with defendant Asset Recovery Specialists, Inc. ("ARS"), to repossess vehicles at a minimum rate of $350 per car. On December 13, 2015, ARS received an order from Wells Fargo Dealer Services to repossess Duncan's vehicle and was provided an address for the vehicle of 1910 Hawks Ridge Drive, Verona, Wisconsin. That address is for an apartment building where Duncan both leases an apartment and a parking stall.

3

On January 27, 2016, defendant Greg Strandlie, acting as president and sole owner of ARS,[3] and another individual, Ryan Williamson, went to the designated address. Strandlie avers that he observed the door to the parking garage was open, and it remained open during the entire period that they were present. (Defs.' PFOFs (dkt. #34) ¶ 18.) Even more specifically, Strandlie represents that they did not have to open or unlock any door to gain entry. Strandlie also avers that during the repossession of Duncan's car, which was in that parking garage, he observed a maintenance man near the garage who never objected to Strandlie and Williamson's presence.

In contrast, Duncan contends that the door must be opened by a remote and closes right after a car exits. (Pl.'s Resp. to Defs.' PFOFs (dkt. #39) ¶ 18.) Still, Duncan concedes that she cannot identify anyone else who was present to witness the repossession of the car, nor how Strandlie and Williamson gained entry to the garage. Duncan further concedes that she did not personally observe the repossession.

Upon entry into the garage, Strandlie avers that he observed Duncan's car, the 2014 Kia Optima, along with other vehicles. There is no dispute that Duncan's car could not be viewed, either through a window or an open door, from outside of the building. Strandlie also avers that he saw no sign at the entry to the garage restricting entry, nor does Duncan aver that one is posted, though she points out that there are private property signs located at both entrances to the building's driveway from the street. (*See* Duncan Aff., Ex. 1 (dkt. #43-1).) Strandlie verified that the vehicle in question was the subject of the repossession

---

[3] At all times relevant to the possession of Duncan's vehicle, it is undisputed that Strandlie was acting in his role as president and employee of ARS.

order, after which Williamson drove the ARS tow truck into the garage and hooked up the vehicle.[4] The vehicle was then towed to ARS's facility at 280 Business Park Circle on January 27th. Duncan discovered that her vehicle was no longer in the apartment garage around 4:00 p.m. that same day.

### D. Parking Garage Configuration

The parking garage is located under Duncan's apartment building.[5] There are no apartments on the ground floor level. From the parking garage, residents generally need two keys to access their apartments -- one to access the building and one to access their individual apartments. There are no living quarters, places to sleep, cook, eat, watch television, use a restroom or bathe or shower in the garage area. As such, Duncan admits that she has never lived or resided in the garage.

There are three ways to access the garage. First, it can be accessed by a large, vehicle-sized door. This garage door is operated by a remote opener given to tenants when they pay for a parking space in the building. Duncan maintains that this garage door can only be opened from outside by an opener. Second, the garage can be accessed by a person-

---

[4] During the hookup process, the tow bar on the truck must be lowered to the ground and then backed under the vehicle to be towed, which can leave marks on the pavement in the area where the vehicle was located. While Strandlie testified at his deposition that he could not recall whether there were in fact marks made on the floor during this repossession, *Duncan* relies on marks to argue that a jury could infer damage to her vehicle based on the location of the marks vis-à-vis the location of her vehicle. Defendant points out Duncan has no personal knowledge or expertise as to whether any marks were caused by contact between her car and the pavement, as opposed to contact from the tow truck itself.

[5] Plaintiff contends that the garage is in the basement. Whether on the ground floor or basement, it is undisputed that the garage is in a level below any apartments.

5

sized door next to the vehicle door that only opens with a key. Third, the garage can be entered from inside the apartment building.[6] A person could not, however, gain access to the lobby of the building without a key or a resident allowing them to enter.

### E. Post-Repossession Activities

Duncan called Wells Fargo the same day her vehicle was repossessed, January 27, 2016. The unreconstructed notes taken by someone from Wells Fargo on that date indicate that Duncan was:

> advised to call tmro and hopefully they will hav info to conf reinstatement amnt & pmt instructions. She asked if she can get veh today, advised can not bcuz I do not hv update and reinstatement can not do anything until my update is in. she inq additional charges advised 3 perf payments + repo fees but no update can not quote total. She state she will look laws herself and hu.

(Defs.' Resp. to Pl.'s PFOFs (dkt. #48) ¶ 50.)

On January 28, Duncan contends that she was told she would now need to pay $4,700 to get her vehicle back. On January 29, Wells Fargo sent Duncan a notice of plan to sell property and notice of intention to dispose of motor vehicle. (Raabe Aff., Ex. E (dkt. #36-5).) Duncan acknowledges receipt of that notice. While defendants contend that she nevertheless did nothing in response, Duncan represents that she arranged to borrow the $4,700 required in the notice, and asked to inspect the vehicle before paying for it, but was not allowed to do so. (Pl.'s Resp. to Defs.' PFOFs (dkt. #39) ¶ 46.) Duncan

---

[6] Once in the apartment building, one can take the elevator down to access the garage.

further avers that she asked Strandlie where her vehicle was located and was told to contact Wells Fargo, and after contacting Wells Fargo, she was told to contact ARS.

Duncan made no further payments on the vehicle. On February 5, 2016, Wells Fargo directed E&R Towing to pick up the 2014 Kia Optima and transport it to Manheim Auto Action in Illinois. On March 17, Wells Fargo sold the 2014 Kia Optima for $12,300 to Millennium Auto Sales at that auction.

**F. Duncan's Personal Possessions**

Duncan had certain personal property in her vehicle at the time it was repossessed. In her declaration, submitted in opposition to defendants' motion for summary judgment, Duncan avers that soon after her car was repossessed, she contacted Strandlie by telephone to ask about her personal property and was told: "I had to pay . . . $100 to get my property." (Duncan Aff. (dkt. #43) ¶ 11.) Duncan contends that she spoke with him "several times," and he "kept insisting that I had to pay." (*Id.* at ¶ 13.) Strandlie denies this. During her deposition, however, Duncan was asked to describe *everything* Strandlie told her in a phone conversation. In response, Duncan simply testified that he refused to tell her where her vehicle was located and directed her to contact Wells Fargo. (Duncan Depo. (dkt. #38) 135.)[7]

---

[7] The subsequent statements in her declaration, therefore, appear to contradict her earlier deposition testimony, possibly implicating the sham declaration rule. *See Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.2d 1162, 1168-69 (7th Cir. 1996). The court, however, need not fully resolve any arguable contradiction because, as discussed below, any confusion or miscommunication about the $100 fee in prior phone calls was clarified during Duncan's in-person visit with Strandlie at ARS's offices.

7

Duncan also contends that she had difficulty locating ARS's offices. She ultimately went to an ARS office sometime in February after a Madison police officer had contacted Strandlie and was told Duncan could retrieve her personal belongings. Strandlie confirms that Duncan came to the ARS facility on February 16, 2016, and that a police officer was subsequently called and present.[8] Strandlie contends that he presented Duncan with a "receipt for redeeming personal property," which simply acknowledges that she received her personal property. (Strandlie Aff., Ex. B (dkt. #35-2).) Duncan disputes that this is the document she was presented; instead, she claims that she was presented a paper called an "assessment fee." In particular, Duncan states that the document she was presented did not have handwriting on it, but instead, was entirely typewritten.

The receipt shows a handling fee of $100, which defendants explain is a fee paid by Wells Fargo. Strandlie contends that Duncan mistakenly believed that she was required to pay $100 and refused to sign it. In response to this confusion, Strandlie added a handwritten note on the receipt, stating that "all fees billed to WFDS," which stands for Wells Fargo Dealer Services. (*Id.*)[9] Strandlie also explained this to the officer who was present, who, in turn, explained to Duncan that she did not have to pay anything.

Without any clear explanation, Duncan again disputes that she was presented with the receipt. Still, at her deposition, Duncan acknowledged that the officer explained to her

---

[8] It appears that the officer appeared after Duncan became concerned that she would have to pay $100 to retrieve her personal belongings.

[9] Strandlie's testimony that he *added* this handwritten note after originally presenting a type-written form would appear to resolve Duncan's dispute that the form she was handed was not Exhibit B attached to Strandlie's declaration, because the form she was handed was entirely typewritten.

8

that Strandlie needed the receipt signed to acknowledge that she picked up her personal property and that the $100 fee was paid by Wells Fargo not her. Duncan still refused to sign the receipt, and left the facility without her personal property. While at the ARS facility, Duncan never asked to see her personal property, and she never returned for her personal property.

Duncan contends that she had a microwave oven, two auxiliary cords, floor mats, CDs, car cleaner, a garage door opener and $100 worth of change. Duncan does not know the value of the microwave oven, cords, CDs or car cleaner. As for the $100 in change, Duncan testified that it belonged to her son, not to her, though she needs to reimburse him for that loss. As for the floor mats, she testified that she purchased them, separate from the car purchase, and that she believes she paid "$20, $25 or something." (Pl.'s Resp. to Defs.' PFOFs (dkt. #39) ¶ 68 (quoting Duncan Depo. (dkt. #38) 158-59)).) All of the personal property has since been thrown away.

OPINION

Based on the events surrounding the repossession, plaintiff asserts a single claim under federal law: a violation of the FDCPA, 15 U.S.C. § 1692f, against ARS and Strandlie based on their alleged attempt to collect $100 before allowing Duncan to retrieve her personal belongings in the car. In addition, plaintiff asserts a hodgepodge of claims: (1) conversion and civil theft, Wis. Stat. § 895.446, against all defendants; (2) illegal nonjudicial repossession against all defendants; (3) a violation of the Wisconsin Consumer Act, Wis. Stat. § 427.104, against all defendants; and (4) unconscionable behavior against

9

all defendants. The court will first address the FDCPA claim, for which the court has original jurisdiction, and then turn to the tag-a-long state claims.

I. FDCPA Claim

Plaintiff contends that the Wells Fargo's lien on her vehicle was limited to the vehicle itself, and not to her personal contents within the vehicle. As such, plaintiff argues that defendants ARS and Strandlie's assertion of a lien on her personal property violated the FDCPA, which prohibits debt collectors, including repossession agents pursuant to 15 U.S.C. § 1692a(6), from "[t]aking or threatening to take any nonjudicial action to effect dispossession or disablement of property if . . . there is no present right to possession of the property claimed as collateral through an enforceable security interest." 15 U.S.C. § 1692f. (*See* Pl.'s Opp'n (dkt. #41) 10.)

In support of her argument, plaintiff directs the court to *Nadalin v. Auto. Recovery Bureau, Inc.*, 169 F.3d 1084 (7th Cir. 1999). Plaintiff's reliance on that decision is curious given that its holding would appear to foreclose her FDCPA claim. In *Nadalin*, the Seventh Circuit held as a matter of first impression that a challenge to a reposessor company's practice of conditioning return of personal property found in a repossessed vehicle on the payment of a fee did *not* state a claim under the FDCPA, absent any allegation that the reposessor was acting as a lender's agent in enforcing its fee. *Id.* at 1087-88. In fairness, plaintiff attempts to distinguish *Nadalin* on the basis that, here, "Strandlie and Asset Recovery were demanding $100 on *Wells Fargo*'s behalf," and therefore they were acting on behalf of the creditor. (Pl.'s Br. (dkt. #41) 10-11.) Assuming the court were to accept this statement as a very late amendment to plaintiff's complaint, however, that fix is

10

superficial only since the court is not considering the merits of plaintiff's FDCPA claim on the pleadings anymore.

There are two core *factual* problems with plaintiff's claim at summary judgment, a time for plaintiff "to put up or shut up." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (describing summary judgment as the time when the party with the burden of proof at trial must "'put up or shut up,' when a party must show what evidence it has that would convince a trier of fact to accept its version of events") (quoting *Schnacht v. Wis. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)).[10] *First,* plaintiff has failed to put forth any evidence that defendants were attempting to collect $100 from her. The undisputed record reflects that plaintiff was *mistaken* in her belief that defendants were attempting to collect this fee, or at least no reasonable jury could find otherwise. While plaintiff avers in her affidavit that Strandlie initially told her on the phone that she would have to pay the fee, there is *no* dispute that when she arrived at ARS to collect her personal property, Strandlie told her that she did not have to pay. Specifically, *plaintiff* testified at her deposition that when she asked Strandlie about the $100 fee, he told her "that was a fee that he was going to charge Wells Fargo." (Duncan Depo. (dkt. #38) 143.) Duncan also does not dispute that after a police officer, which she had summoned, arrived at ARS, the police officer also told her that ARS was not seeking payment -- either on its own behalf or for Wells Fargo; rather, the $100 fee was an amount to be paid by Wells Fargo to ARS.

---

[10] Plaintiff also points to a fee schedule to argue that the fee should have been $50, rather than $100, since the $100 fee only applied to instances where the loan was redeemed or reinstated. Because it undisputed that the fee was to be paid by Wells Fargo, the amount of the fee, or its proper categorization by ARS, is immaterial to any claim plaintiff could assert.

11

(*Id.* at 144.)  Even assuming Duncan initially believed she would have to pay $100 to retrieve her personal goods, ARS and Strandlie immediately and repeatedly clarified that the fee was to be paid by Wells Fargo instead.

While no reasonable jury could find a violation of the FDCPA based on what Duncan now admits was her mistaken belief otherwise, she argue that the form ABS provided was also misleading, citing *McMillian v. Collection Professionals, Inc.*, 455 F.3d 754, 759-60 (7th Cir. 2006), for the proposition that "[e]ven a literally true letter may violate the law if it conveys a misimpression." (Pl.'s Opp'n (dkt. #41) 12.)  The only form in evidence, however, is the "Receipt for Redeeming Personal Property," attached to Strandlie's affidavit, which is *not* confusing.  That form simply requires Duncan to sign that she has received the items listed in the form.  While the form contains a line for "handling fee," Strandlie clarified that "all fees billed to WFDS."  (Strandlie Aff., Ex. B (dkt. #35-2).)

In opposition, plaintiff maintains that the form provided to her is not the form attached to Strandlie's affidavit, but she neither produced another form nor even described the one she purportedly viewed in a way that would distinguish it from the form produced by defendants.  Moreover, like the misstatement she ascribes to Strandlie over the phone, any possible confusion was again immediately clarified by both Strandlie himself *and* a police officer, both of whom explained that the fee was to be paid by Wells Fargo to ARS *not* by Duncan, something confirmed by a handwritten note on the form ARS produced.  To the extent Duncan persists that Strandlie initially misspoke or there is another form

with confusing language, plaintiff fails to put forth sufficient evidence from which a reasonable jury could find an actual violation of the FDCPA.

*Second*, and more fundamentally, even assuming ARS and Strandlie demanded $100 payment from plaintiff, Duncan has put forth *no* evidence that the fee was to be used to satisfy the plaintiff's debt to Wells Fargo. While this failure may not foreclose a state law claim for conversion, plaintiff's FDCPA claim is doomed absent such evidence for the very reasons described by the Seventh Circuit in *Nadalin*:

> ARB did not seize the plaintiff's personal property for the purpose or with the likely effect of using it to satisfy the plaintiff's debt to ARB's principal. The seizure was not a method of enforcing a debt owed to the lender. It was not an effort to claim and seize additional collateral for the loan.

169 F.3d at 1087. Plaintiff cannot simply *allege* that ARS and Strandlie were Wells Fargo's agents; instead, she needed to put forth evidence to demonstrate that the $100 fee was demanded to satisfy her loan with Wells Fargo. That, plaintiff failed to do. *See Johnson*, 325 F.3d 892.

## II. State Law Claims

In light of the decision to grant defendant's motion for summary judgment as to that claim, the usual practice is to dismiss any remaining state law claims without prejudice. *See Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999) ("The usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial."). A court may depart from its "usual practice" and continue to exercise supplemental jurisdiction over "'doomed litigation' that will only be dismissed" in state court. *Groce*, 193 F.3d at 502; *see also In re Repository Tech., Inc.*, 601 F.3d 710, 725

(7th Cir. 2010) ("[W]hen a state-law claim is clearly without merit, it invades no state interest -- on the contrary, it spares overburdened state courts additional work that they do not want or need -- for the federal court to dismiss the claim on the merits, rather than invite a further, and futile, round of litigation in the state courts.") (internal quotation omitted).

Three of plaintiff's state law claims, or at least aspects of those claims, appear to touch on the same failed theory supporting her FDCPA claim, namely that defendants Strandlie and ARS were attempting to collect a $100 fee in return for her personal belongings. To the extent any of these claims are asserted against defendant Wells Fargo, and it appears they are, they are doomed for the same reasons outlined above. To the extent the claims are asserted against defendants Strandlie and ARS, they hang on the thin reed that Strandlie initially misrepresented her need to pay $100 to get her personal belongings back and a phantom memo from ARS to the same effect. While this court believes no reasonable jury could find against any of the defendants on that thin reed, a state court might conclude otherwise, so this court hesitates to find those claims doomed. Accordingly, the court will grant judgment to defendant Wells Fargo on plaintiff's conversion and civil theft claim (Count II), Wisconsin Consumer Act, Wis. Stat. § 427.104, claim (Count IV), and unconscionable behavior claim (Count V) to the extent that those claims rest on defendants' possession of Duncan's personal belongings, but not to defendants ARS and Strandlie. As for plaintiff's claims relating to the manner in which her vehicle was repossessed and any damage to the vehicle, they are sufficiently unrelated

to the FDCPA claim to warrant dismissal without prejudice as to all of the defendants. Plaintiff may pursue those claims in state court if she so chooses.

ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment (dkt. #33) is GRANTED IN PART AND DENIED IN PART. The motion is granted as to plaintiff's FDCPA claim (Count I) and the portions of certain state law claim premised on the same allegations concerning her personal property (Counts II, IV and V) to the extent asserted against defendant Wells Fargo. In all other respects, in light of the court's declining to exercise supplemental jurisdiction over the other state law claims, the motion is denied.

2) Plaintiff's unreasonable sale claim against Wells Fargo is dismissed with prejudice.

3) The court declines to exercise supplemental jurisdiction over any other state law claims. Those claims, or portions of claims, are all dismissed without prejudice.

4) The clerk of court is further directed to enter judgment consistent with this order and close this case.

Entered this 5th day of July, 2017.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge